(79 Misc. Rep. 304.)

## EYSAMAN v. NELSON et al.

(Supreme Court, Equity Term, Herkimer County.　March, 1912.)

1. WILLS (§ 602*)—CONSTRUCTION—ESTATES DEVISED.

Where a testator devised his property to his wife for life, and then in trust for his son, with the provision that, after the death of the son, it should be divided equally among his children or heirs, should he die leaving lawful descendants, and that they should take per stirpes and not per capita, the son took an absolute estate subject to be divested only upon the event of his leaving children surviving him, and consequently upon his death without issue his will passed the entire corpus of the estate.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1351–1359; Dec. Dig. § 602.*]

2. WILLS (§ 686*)—TITLE OF TRUSTEE—TERMINATION.

Where a testator devised land in trust for his son for life, but made no disposition after his death, the death of the son revoked all title of the trustee, and he is not warranted in retaining possession.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1631–1637; Dec. Dig. § 686.*]

3. ATTORNEY AND CLIENT (§ 147*)—COMPENSATION—CONTINGENT FEES.

Where an attorney knew that his client was absolutely entitled to a large estate of over $50,000, an agreement that he should have one half of any part of the estate he might recover was unconscionable, and will not be enforced.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 351; Dec. Dig. § 147.*]

4. TRUSTS (§ 225*)—TRUSTEES—EXPENSES.

A trustee of a testamentary trust is not entitled to an allowance for the keeping of a team which he used in the discharge of his duties.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 322; Dec. Dig. § 225.*]

5. ATTORNEY AND CLIENT (§ 103*)—RETAINER—EFFECT.

Where an attorney was retained to represent those claiming an interest in the estate of decedent and his clients ratified his acts, they are liable for such acts on the principle of agency.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 154; Dec. Dig. § 103.*]

6. DEEDS (§ 70*)—VALIDITY—FRAUD—MISTAKE.

While equity will not relieve for a mistake of law, no other elements being present, yet in case of fraud the rule is different; consequently, where one entitled to a large property conveyed the whole of it in return for the release of a small portion in ignorance of her rights, the conveyance, which was induced either through the fraud or gross negligence of her attorney in permitting her to yield to a claim known by the grantees to be unfounded, will be set aside.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 165–182; Dec. Dig. § 70.*]

7. PLEADING (§ 78*)—ANSWER—WHAT CONSTITUTES.

Under Code Civ. Proc. § 500, providing that an answer shall contain a general or specific denial of each material allegation of the complaint controverted by the defendant, and the statement of any new matter constituting a defense, an instrument designated an answer which spe-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cifically admitted all of the allegations of the complaint, and prayed for the relief therein prayed for, is unauthorized.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 158, 159; Dec. Dig. § 78.*]

**8. Deeds (§ 211*)—Cancellation—Fraud—Evidence.**

In a suit to set aside a conveyance of property on the ground of want of consideration and fraud, evidence *held* to show that plaintiff was induced to enter in a most unconscionable bargain in ignorance of her rights, and that it was only through the gross negligence or fraud of her attorney she made the conveyance.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 637–647, 649; Dec. Dig. § 211.*]

**9. Deeds (§ 210*)—Consideration—Evidence.**

In a suit to set aside a conveyance of property on the ground of want of consideration, mistake, and fraud, evidence *held* to show that the contention that, in return for the conveyance, defendants surrendered their rights to contest the will of plaintiff's intestate, was an afterthought, and was not a consideration for the conveyance.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 635, 636; Dec. Dig. § 210.*]

**10. Compromise and Settlement (§ 8*)—Colorable Claim.**

While the forbearance to assert either an equitable or legal claim will constitute sufficient consideration for a deed, yet the claim must be at least a colorable one, and there must be an actual dispute, consequently where plaintiff was entitled to a large property under the will of her husband, and his heirs induced her, in ignorance of her rights caused by the fraud or negligence of her attorney, to accept only a part of the property which she was entitled to, there was no compromise or binding settlement to support her conveyance of the remainder.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 17–31, 33; Dec. Dig. § 8.*]

**11. Deeds (§ 17*)—Wills (§ 221*)—Consideration—Equitable Estoppel—What Constitutes.**

Where defendants purchased personalty sold by plaintiff as administratrix under the will of her husband, their act will estop them from denying the validity of the will, so that they cannot claim that their waiver of the right to move for revocation of the probate of the will was consideration for a conveyance of property which plaintiff took under the will of her husband.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 26–37; Dec. Dig. § 17;* Wills, Cent. Dig. §§ 539–541; Dec. Dig. § 221.*]

**12. Trusts (§ 333*)—Accounting—Setting Aside.**

In an action to set aside a conveyance of land which was made in accordance with the provisions of a judgment settling the accounts of the trustee of the estate of plaintiff's husband who devised the land to plaintiff, and to set aside the judgment, evidence *held* to show that the judgment was secured by fraud.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 333.*]

**13. Pleading (§ 333*)—Service of Answer.**

Where, in an action by a trustee for a judicial settlement of his accounts, defendants attempted to have adjudicated the right to the trust property, the answer of the defendant demanding the determination must under the direct provisions of Code Civ. Proc. § 521, be served 20 days before trial, and a service only the day previous is insufficient.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1011, 1012; Dec. Dig. § 333.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

14. TRUSTS (§ 305*)—ACTION TO SETTLE ACCOUNTS—ISSUES.

In an action by a trustee of a testamentary trust for the judicial settlement of his accounts where his complaint sought no further relief, independent demands between the parties claiming the corpus of the trust could not be litigated, being foreign to the action set up.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 421–426; Dec. Dig. § 305.*]

15. JUDGMENT (§ 736*)—CONCLUSIVENESS—MATTERS CONCLUDED.

Where, in an action by a trustee for the judicial settlement of his accounts, it was sought by defendants, who claimed the corpus of the estate, to litigate that question, the judgment, though purporting to determine that question, is no bar to a subsequent action; such issues being foreign to the complaint.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1264, 1265; Dec. Dig. § 736.*]

16. JUDGMENT (§ 511*)—COLLATERAL ATTACK—VALIDITY—FRAUD.

Where, in an action for the judicial settlement of a trustee's accounts, a judgment, determining the rights of various parties to the corpus of the trust was secured by fraud, an attorney under a limited authority purporting to act for plaintiff who was never served with the defendant's answer demanding such adjudication, it may be set aside even on collateral attack.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 951, 954; Dec. Dig. § 511.*]

17. ATTORNEY AND CLIENT (§ 123*)—COMPENSATION—CONTRACTS.

The courts will scrutinize with great care contracts between attorneys and clients; it being necessary to show that there was no fraud or mistake, and that the transaction was perfectly understood by the weaker party.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 239–245, 247–249; Dec. Dig. § 123.*]

18. ATTORNEY AND CLIENT (§ 147*)—CONTRACTS—COMPENSATION.

Even though a client absolutely entitled to a large property worth about $50,000 agreed to give her attorney one-half of what he might recover, the attorney is not entitled to a fee of $3,500 for a recovery of about $7,000, such sum being out of all proportion to the service rendered.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 351; Dec. Dig. § 147.*]

19. ATTORNEY AND CLIENT (§ 147*)—CONTRACTS—PRESUMPTIONS.

Where a client entitled to a large estate entered into a contract with her attorney to pay him one-half of what he might recover, there is a presumption against the propriety of the transaction.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 351; Dec. Dig. § 147.*]

20. ATTORNEY AND CLIENT (§ 124*)—COMPENSATION—RECOVERY BY CLIENT.

Where a client in pursuance of an unconscionable agreement transferred a mortgage to the attorney's wife in payment of the exorbitant fee, the fact of the assignment to the wife will not relieve the attorney from the duty to reimburse the client.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 246; Dec. Dig. § 124.*]

Action by Bertha J. Eysaman, individually and as executrix of Fred G. Nelson, deceased, against Walter Nelson and others. Judgment for plaintiff.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

William S. Rhodes, of Little Falls (Henry V. Borst, of Amsterdam, of counsel), for plaintiff.

A. M. Mills, of Little Falls (Charles E. Snyder, of Herkimer, of counsel), for defendants Nelson, and others.

Robert F. Livingstone, of Little Falls, in pro. per. and for defendant Eaton.

MERRELL, J.   This action is brought to set aside a deed of real property in Herkimer county, executed by the plaintiff in March, 1906, and to vacate and set aside a judgment in an action in Supreme Court entered in Herkimer county in April, 1906, in so far as said judgment affects plaintiff or her rights, and for other incidental relief. The plaintiff predicates her demand upon an entire lack of consideration for the conveyance which she, in alleged ignorance of her legal rights in the premises, executed, and that said deed and judgment were obtained through a fraud practiced upon her by the defendants. The facts are somewhat complicated, and require a detailed recital.

In May, 1892, one George Nelson died, a resident of, and seised and possessed of valuable real and personal property in, Herkimer county, consisting of two large dairy farms and a half interest in a third, together with stock and personal property thereon, and bonds, mortgages, and other personal estate.   He left him surviving his widow, Elnora Nelson, and one child, a son, Fred Nelson.   He was also survived by a brother, the defendant Walter Nelson, and by four nieces, the defendants Kate Pearce, Ida W. Fenner, Elva W. Pomeroy, and Jeanette Willoughby, daughters of a deceased sister.   He left a last will and testament, which was duly admitted to probate in the Surrogate's Court of Herkimer county on the 17th day of June, 1892. By said will the testator gave to his widow, Elnora Nelson, the use of all his real and personal estate during her lifetime, and named his said widow sole executrix of said will.   The testator then named one James D. Feeter, of Little Falls, N. Y., as trustee of his estate, to take possession of all of his property, real and personal, in trust, to take effect at the close of his widow's life, and to manage and control the same and to receive the rents and income thereof during the lifetime of testator's son, Fred G. Nelson, with power in said trustee to pay and turn over to the said son Fred such sum from said income annually as said trustee might deem expedient and beneficial to said son during the latter's lifetime.   Said will further provided that the principal and body of testator's estate remaining at the close of the life of testator's said son should be divided equally among his children or the heirs of the same, should said Fred G. Nelson die leaving lawful child or children or descendants of such child or children, they to take the same per stirpes, and not per capita.   The will contains no further provision as to the disposition of the remainder of testator's estate after the death of Fred G. Nelson than as stated.

The testator left two large farms, one of about 225 acres, known as the "Danube farm," one of about 326 acres, known as the 'Homestead farm," and upon which the testator and his family resided.   He

also owned a half interest in a farm known as the "Churchill farm," of about 125 acres, his wife, Elnora Nelson, owning the other half interest therein, the husband and wife owning the said farm as tenants in common, and not as tenants by the entirety. The wife's undivided half interest in the Churchill farm was incumbered by a mortgage thereon held by testator for $2,265. The entire estate of testator at the time of his death amounted to about $60,000. Immediately upon his death, testator's widow took possession of all of his property and estate, and managed the same, and enjoyed the use thereof until her death, which occurred March 9, 1897. Elnora Nelson died intestate, leaving as her only heir at law and next of kin her surviving the son, Fred G. Nelson, and thereupon the said Fred G. Nelson became seised of his mother's half interest in the Churchill farm, subject to said mortgage thereon held by his father's estate, and also of such personal estate as his mother left.

On March 13, 1893, the plaintiff married Fred G. Nelson, and went to live with him and his mother on the Nelson Homestead farm, and continued to reside on said farm until after her mother-in-law's death, when she, with her husband, moved to the city of Little Falls. At the time of her marriage plaintiff was 18 years of age. Her education was limited to what she received at common school, she never having attended high school, and it would seem was wholly without business experience. Upon the death of Elnora Nelson, the widow of George Nelson, when the trust provided in the latter's will became operative, the trustee, James D. Feeter, named by testator, declined to qualify. Thereupon such proceedings were had in the Surrogate's Court of Herkimer county that the defendant Irving Eaton was appointed trustee of said will in place of said Feeter, and said Eaton immediately qualified as such trustee, and took possession of all of the property of said estate. Thereafter, during the lifetime of Fred, the said trustee managed said farms, and acted as such trustee under said will. The title to the stock on the farms had largely passed to Fred as next of kin of Elnora Nelson or otherwise, and this stock he voluntarily transferred to said trustee upon the latter's agreement that, upon Fred's death, it should be returned to the representatives of his estate, and be disposed of under his will.

[1] Fred G. Nelson, plaintiff's husband, died March 15, 1905, leaving no children or descendants. He left a will devising and bequeathing to the plaintiff, his widow, all of his property and estate, which will was on the 29th day of May, 1905, duly admitted to probate in Surrogate's Court of Herkimer county as a will sufficient to pass the real and personal estate of the testator. This will was executed on October 8, 1900. The defendant Irving Eaton was a witness to its execution. Under well-settled principles of law, Fred G. Nelson, by the terms of his father's will, took an absolute estate in all of George Nelson's property, real and personal, subject to be divested thereof only upon the event of the son's leaving a child or descendant him surviving, and upon the death of Fred G. Nelson without leaving children or descendants him surviving all of his property and estate, including

all the remainder of the estate of George Nelson, deceased, passed. under Fred's will to the plaintiff absolutely. That the plaintiff was entirely ignorant of her legal rights or that upon her husband's death she acquired any interest in the property and estate of George Nelson, deceased, seems entirely apparent. It is equally clear that however ignorant she may have been, or whatever pretended claims thereto may have been advanced by persons not legally entitled to share therein, the legal title to the remainder of the George Nelson estate passed to the plaintiff under her husband's will as fully and perfectly as did his half interest in the Churchill farm, which came to him from his mother, or any other of his personal estate. The contingency of the cestui que trust dying leaving descendants not occurring, the entire estate of George Nelson, deceased, upon Fred's death passed to the latter's estate, and to plaintiff under his will. Upon this proposition the law has for many years been well settled and recognized as sound legal doctrine. Matter of Kane, 2 Barb. Ch. 375; Tompkins v. Verplanck, 10 App. Div. 572, 42 N. Y. Supp. 412; Simonson v. Waller, 9 App. Div. 503, 41 N. Y. Supp. 662; Clark v. Cammann, 160 N. Y. 315, 54 N. E. 709; Doane v. Mercantile Trust Co., 160 N. Y. 494, 55 N. E. 296. After Fred G. Nelson's death, the defendant Eaton, who had been made trustee of the George Nelson estate, and who had had the management thereof during Fred's life, and who had acted as one of the witnesses to his will, undertook to advise plaintiff and counseled her to employ the defendant Robert F. Livingstone, who was Eaton's son-in-law, to act as her attorney in the proceeding to probate her husband's will and in the settlement of his estate. As before stated, the plaintiff was an uneducated woman, without business experience, and naturally was quick to accept the counsel thus proffered by one who had been so intimately connected with the business affairs of the family. She employed Livingstone as her attorney. That plaintiff from thenceforth relied implicitly upon her said attorney, the wisdom of his counsel and his devotion to her cause, succeeding events conclusively show.

[2] Upon the death of Fred, the cestui que trust, all title of Eaton, the trustee, in the trust estate at once ceased. His only office remaining was to account for his acts as trustee, and to turn over to the legal representative of Fred any net income remaining in his hands undistributed and any personal estate in his possession. The real estate held by him in trust passed by operation of law, and no act on the part of said trustee was required to effectuate such transfer. Notwithstanding the clear limitations of his legal authority, the trustee did hold possession of the trust estate, real and personal, for about two years after his legal right thereto had ceased. As before stated, the stock upon the farms belonged to plaintiff's husband, and under his will passed to her. This stock she sold in the fall after her husband's death to the brother of George Nelson and the nieces, who, as plaintiff was advised, inherited all the George Nelson estate upon her husband dying without leaving descendants. Such claims as this brother and these nieces were putting forth for this property were seconded by the

erstwhile trustee and plaintiff's counsel; no one seeming to question their right thereto, nor to bestow a passing thought upon the rights of the real owner. Eaton and Livingstone thought plaintiff might as well sell her cows and stock which was then on the Homestead and Danube farms to the defendants Nelson, Pearce, Fenner, Pomeroy, and Willoughby. For this stock the purchasers paid Livingstone, plaintiff's attorney, $3,200, received from the proceeds of a real estate mortgage, known as the Hunt mortgage, and which was a part of the trust estate of George Nelson, deceased, and which mortgage was in fact owned by the plaintiff herself. Thus we have the anomalous condition of the Nelson heirs (so-called) purchasing and receiving $3,200 worth of personal property of plaintiff, and paying for it with money which belonged to her—an exceedingly profitable transaction to the purchasers. This $3,200 of plaintiff's money which had been paid to her for her stock was used by Livingstone to discharge debts and obligations owing by plaintiff's husband's estate, with the exception of a balance of about $200 turned over to plaintiff.

Matters drifted along, the defendants Walter Nelson et al. apparently secure in their ownership of the George Nelson estate, the trustee Eaton still in possession, and the plaintiff, the real owner, in entire ignorance of her rights, until late in January, 1906, when Livingstone writes the plaintiff, warning her against signing any papers without first consulting him or taking good counsel. Evidently plaintiff's curiosity was aroused by this missive, for she at once proceeded to her attorney's office. As to just what occurred there at Livingstone's office there is some dispute. The plaintiff testifies that the attorney told her that, while she had no interest in the George Nelson property, he might be able to scare them (meaning the brother and nieces) into giving her something. Plaintiff testifies that she told him on this occasion that, if he could get anything for her, she would be willing to share with him, and that he told her he would not ask her to share with him, but he would ask her a large fee probably. Shortly after plaintiff again called at her attorney's office, and she testifies that he then told her that he thought he could get some of the George Nelson property for her, and that he hoped the Nelson heirs would employ Senator Mills; that he might get it easier from Senator Mills than other local attorneys whom the heirs might employ; that Senator Mills thought that plaintiff ought to have some of the property. Plaintiff testifies that she again called upon her attorney a few days later, and that he then told her he thought he could scare them into giving her something by tying up the property in litigation.

Livingstone gives a somewhat different version of these consultations with his client. He testifies that while he was making preparation to draw the final account of his father-in-law as trustee of the George Nelson estate in January, 1906, and just prior to writing plaintiff the warning letter of January 25, 1906, and as he was for the first time examining George Nelson's will, the idea came to him that Fred Nelson might have taken more than a life estate under his father's will, and that when plaintiff first called at his office late in January, 1906, he advised her that he thought possibly there was a question

whether Fred Nelson was not entitled to the remainder of the George Nelson estate; that later he looked it up further, and wrote plaintiff a letter on February 6th, 1906, as follows:

"Mrs. Bertha J. Eysaman,    February 6th, 1906.
    "West Main Street,
        "Little Falls, N. Y.

    "My Dear Mrs. Eysaman:—I wish you would come in and see me about the Nelson trust estate matters. Mr. Eaton is anxious to make his accounting and be discharged and the Nelsons are urging him to do so and turn the property over to them.

    "You should take some decided stand in the matter, and if not everybody should be made a party in the action to settle his accounts and the contention as to ownership tried out there. If you take some positive action now, it can be settled first, and then Mr. Eaton can make his accounting without any trouble, or litigation and as he is getting along in years I would like it if he could avoid further trouble and annoyance in the matter.

    "I have thought over the George Nelson will and looked it up some, and I am of the opinion that Jones was right when he said you would receive all the trust property from Fred under his will if he died without children. It was his property if he died without children, and he wills it all to you; his father did not dispose of it to anyone else beyond Fred's children, if he had any.

    "I wish you would let me know just what you intend to do right along, as Mr. Eaton must have his accounts settled soon.

        "Yours respectfully."

Livingstone, while testifying that he wrote this letter, does not claim to have mailed it, but testifies he delivered it to his stenographer for mailing. He does testify that the day following, February 7th, plaintiff called at his office, and said she had received his letter. Livingstone testifies that he then told her substantially what he had written in the letter, and that plaintiff then told him that, if he thought it was hers, to go ahead and see what he could get out of it for her, and that she would give him half of it. Livingstone testifies that he replied that he would not say anything about that then, but would have to think it over. Plaintiff denies any remembrance of ever having received the letter which Livingstone claims to have written on February 6, 1906, and denies that he ever told her that she had any legal claim to the George Nelson property, and insists that the first intimation she ever had that the property passed to her upon her husband's death was shortly before the commencement of this action in 1911. It is quite essential in the determination of this controversy to discover where the truth lies as the advice which Livingstone gave his client in January and February, 1906. Did he advise her that she, in fact, was entitled to the George Nelson estate remainder? Did he write the letter of February 6, 1906? Or is he mistaken in having been fully informed of plaintiff's legal rights in the premises, and in having advised plaintiff with reference thereto?

The alleged letter of February 6, 1906, contains some peculiar features. The plaintiff lived in the same city as her attorney, and but a short distance from his office. At that time she appears to have been a very frequent caller at his office, counseling with him as to her various legal matters. To say the least, the letter is very formal under all the circumstances. If it was in fact written and sent, and if on the day after, on February 7, 1906, plaintiff called at the attorney's office

and was informed of her absolute right to all the George Nelson remainder, the attorney must have been fully aware that she was legally entitled to all the property, and that her title thereto was perfect, and must ultimately prevail. And yet on February 10, 1906, four days after writing this most formal letter to plaintiff, evidently in the interest of Eaton, and but three days after the last-mentioned interview, Livingstone did write plaintiff as follows:

"Feby. 10, 1906.

"My Dear Mrs. Eysaman: If you will call at my office I will talk over your proposition to me about taking case of your claim to Nelson estate, as I see no reason why I should not take it as suggested by you.

"Yours sincerely,    Robt. F. Livingstone.

"To Mrs. B. J. Eysaman, Little Falls, N. Y.

"P. S. Excuse this scribble, but my stenographer has gone for the day."

In this letter he speaks about taking the case of "your claim to the Nelson estate," and sees no reason why he should not take up her proposition as to a division. On February 6, 1906, Livingstone claims to have written plaintiff that in his opinion she would receive the entire trust estate. Livingstone testifies that when plaintiff called in response to his letter of February 10, 1906, he told her he had been thinking over her proposition, and had decided to take her up, and "would go ahead and look it up."

On February 15, 1906, Livingstone prepared an agreement, which was executed by plaintiff and acknowledged by her on February 22, 1906. That agreement is as follows:

#### "Retainer and Agreement.

"Whereas, I, Bertha J. Eysaman, as widow of Fred G. Nelson, and sole legatee and devisee under the will of said Fred G. Nelson, deceased, claim to have an interest in the property constituting the estate of George Nelson, deceased, and which interest and right is in some doubt and is uncertain, and is denied and contested by the heirs at law of said George Nelson, deceased, who claim the whole of said estate:

"Now therefore, I do hereby retain Robert F. Livingstone of Little Falls, N. Y., to appear for me and act as my agent and attorney in bringing about and negotiating a settlement of my said claim and interest; and I hereby empower and authorize him to compromise and settle said claim and adjust the same with said heirs, as in his judgment seems just and advantageous, and I agree not to settle or compromise the same without the consent of my said attorney. I agree to pay said Livingstone for his services and expenses therein in making said settlement and compromise a sum equal to one-half the total amount of money received or recovered by me and one-half the total value of any and all property recovered or received by me or turned over to me on such settlement or compromise, and I agree to pay my said attorney and agent in cash therefor, or, at his election, to sell and convey to him therefor an equal undivided one-half unencumbered interest in all moneys, and property (real and personal) recovered, received or turned over to me on such settlement or compromise.

"I further agree that my said attorney shall have a special lien upon all such moneys and property and the subject-matter of said trust estate for his fee, pay and services aforesaid.

"Witness my hand and seal this 15th day of February, 1906.

"Bertha J. Eysaman    [L. S.]

"State of New York, County of Herkimer—ss.:

"On this 22d day of February, 1906, before me, personally appeared Bertha J. Eysaman, to me known and known to be the person described in and who executed the foregoing instrument, and duly acknowledged to me that she

executed the same; and who, being by me duly sworn, did depose and say, that she was acquainted with the foregoing instrument and understood the terms thereof and had read over the same.

"William S. Rhodes, Notary Public."

If Livingstone was aware, as he claims to have written plaintiff February 6, 1906, and claims to have repeatedly advised her that she was legally entitled to all of the trust estate, why was he, two weeks later, making her say that she claimed "to have an interest in the property constituting the estate of George Nelson, deceased, and which interest and right is in some doubt and is uncertain"—a most remarkable position for one to take who had received the information and advice that Livingstone claims to have given plaintiff.

[3] Again, it seems incredible that any one in the possession of her natural faculties would voluntarily turn over half a large estate when advised that the whole estate is hers absolutely. And, further, Livingstone, if he possessed the accurate knowledge of plaintiff's right to the entire trust estate that he professes to have had, must have known that any such agreement to share in the estate as he prepared and plaintiff executed would have been brushed aside, at once the matter was brought to the attention of any court, as quite unconscionable. Turnbull v. Banks, 22 App. Div. 508, 48 N. Y. Supp. 40; Matter of Holland, 110 App. Div. 799, 97 N. Y. Supp. 202. And if Livingstone clearly understood and advised plaintiff of her right to take the entire trust estate, why did he on March 2, 1906, prepare and have his client sign an unilateral agreement, whereby she was to accept a deed from the brother and nieces of George Nelson of the undivided one-half interest in the Churchill farm, free of incumbrance, and $3,500 in cash, and in consideration thereof convey to the brother and nieces the residue of the trust estate? If he knew she was entitled to the entire estate, why did he sanction the taking from her of seven-eighths of the estate by those who had not the shadow of title thereto? Livingstone as a lawyer must have known that his client was entitled to the whole if she was to a part. If he did know his client's rights, he was guilty of gross malpractice in permitting her to voluntarily relinquish her rights. Livingstone testifies that he examined the authorities and looked up the law. It is almost inconceivable that he did not learn plaintiff's rights if he made the study of the matter which he claims. But, if he did, it is just as inconceivable that he would have permitted his client to have been deprived of her property as she was. A charitable view is that Mr. Livingstone failed to quite appreciate the legal status of his client, and with her became the prey of others better informed than he, who, with a bold front and through fictitious claims positively asserted and insisted upon, were able to lull suspicion and obtain the bulk of the estate. The plaintiff testifies that the most Livingstone claimed to her was that he might be able to "scare" something out of the brother and nieces by threatening to tie up the estate in litigation. I am of the opinion that her version of the matter and of the advice of her attorney tallies much more satisfactorily with the admitted facts and circumstances than that of the attorney. Her version of the advice given her, of her offer to divide what might be gotten out of the brother and nephew by scaring them,

of Livingstone's statement of Senator Mills' generous impulse toward plaintiff, is in entire harmony with Livingstone's note to plaintiff of February 10, 1906, asking her to call with reference to her proposition about her "claims to Nelson estate," with the agreement itself which plaintiff executed, bearing date February 15, 1906, in which he has her recite that she claims "to have an interest in the property * * * which interest is in some doubt and is uncertain," and is in absolute harmony with succeeding events when a "settlement" was reached, whereby plaintiff yielded up a valuable estate for little more than a pittance.

By the agreement of March 2, 1906, the plaintiff agreed to convey unto Walter Nelson, the brother, and Elva Pomeroy, Ida Fenner, Kate Pearce, and Jeanette Willoughby, nieces of George Nelson, deceased, who were posing as claimants to the trust estate, all her interest individually and as executrix of her deceased husband's estate in said trust estate, including the Danube farm, the Nelson Homestead farm, and all the personal property of said trust estate for the sum of $9,515. This consideration was to be paid by the conveyance by Walter Nelson and the nieces of the undivided one-half interest in the Churchill farm owned by George Nelson at his decease, and to satisfy a mortgage of $2,265 held by him at his decease against his wife's half interest in said Churchill farm, and to which half interest plaintiff had succeeded, and to pay to plaintiff in cash or to secure the payment to plaintiff by first mortgage upon either the Danube or Homestead farm the sum of $3,500. Subsequently this agreement was carried out. The plaintiff received a deed of the half interest in the Churchill farm of which she had been, since her husband's death, the owner. The brother and nieces went through the form of discharging a mortgage which passed to plaintiff at her husband's death, and which undoubtedly merged in her superior title. The mortgage for $3,500 was given, and this was taken by Livingstone as his share under his agreement with plaintiff. And plaintiff on her part conveyed to the brother and nieces the two large farms with all personal property thereon and all that remained of the trust estate. If Livingstone knew that his client was legally entitled to the entire trust estate, how could he permit her to sign away an estate rightfully belonging to her worth $40,000 for a farm of 125 acres which in the transaction was figured to be worth $3,750? Upon doing this, how could he justify himself in taking from her $3,500 in cash? In these transactions Livingstone was either ignorant of his client's legal rights and was misled into giving her incorrect advice, or he was a party to a scheme, to deprive her of her rights. If he fully appreciated his client's rights, his conduct can bear but one interpretation.

An interesting side light on this controversy is revealed by the manner in which the estate was handled by the trustee, Eaton, the father-in-law of Livingstone and an adviser of plaintiff. As before stated, on the refusal of the trustee named by the testator to qualify, Eaton was on April 15, 1897, appointed by the Surrogate's Court of Herkimer county trustee under said will. Eaton at once qualified, and entered upon the discharge of his trust. Commencing in December,

1899, said trustee annually accounted for his acts. These annual accountings were not had in the Surrogate's Court of Herkimer county, where the trustee was appointed and where the expense of such proceeding would have been comparatively small, but said trustee annually brought an action in the Supreme Court for the settlement of his accounts. And annually a formal summons and complaint is prepared and served upon the cestui que trust. No answer is interposed by the cestui in most instances, or, if a so-called answer is served, it is a mere perfunctory affair admitting the complaint, and the trustee and his attorney and an attorney for the cestui que trust each year appear before Mr. Justice Scripture and the trustee's accounts are formally approved, and a decree granted passing the account with allowances to all concerned. The judgment rolls show that the complaint is verified and with the summons served upon the cestui, who, in turn, "appears" by an attorney and all hands proceeding to a court held by the same Justice each year the decree and allowances are obtained—all within a period of a day or two. By the decree in the first annual action to account, the commissions of Eaton, as trustee, are allowed at $412.49, and an allowance for "additional expense" of $400 was made. The attorney for the trustee was allowed $350 for his services. The attorney for the cestui que trust was allowed $100, and "W. W. Cooper, accountant, "$400." In view of the generous treatment accorded to all concerned, it is not strange that the necessity was felt for annual actions in the Supreme Court to account.

The second annual accounting occurred in February, 1901, when another action in Supreme Court was brought by the trustee. Again, the pilgrimage to the same court is made, the trustee's accounts are passed, the trustee is allowed by the court commissions to the amount of $198.92, "Additional Expense," $130, the attorney for the trustee is allowed $187, and the attorney for Fred, $100.

The next annual action for an accounting culminates in a decree granted by the same court, in which the following allowances are made:

Commissions to trustee.................................................. $155 01
Additional expense..................................................... 175 00
Attorney for trustee................................................... 190 00
Attorney for Fred...................................................... 100 00

The fourth annual action to account followed the course and expedition of its predecessors, and was brought to the court's attention in January, 1903, with the result that the trustee's accounts were passed with the following allowances:

Eaton, trustee, commissions............................................ $195 96
"Additional allowance"................................................. 175 00
Attorney for trustee................................................... 175 00
Attorney for Fred...................................................... 50 00

The fifth annual action was brought before the court in February, 1904, and by the decree entered therein the following allowances were made:

Eaton, trustee, commissions............................................ $195 58
"Additional allowance"................................................. 175 00
Attorney for Fred...................................................... 50 00
Livingstone, attorney for Eaton........................................ 175 00

The last action to account prior to the death of the cestui que trust was in January, 1905. The same forms were observed in this action as in those that preceded it. The action was brought by Livingstone as attorney for the trustee. The cestui que trust was represented by attorney, who admitted the allegations of plaintiff's complaint, and all hands proceed to Justice Scripture's court to obtain the adjudication, and a decree is granted approving of the trustee's accounts and making the following allowances:

| | |
|---|---:|
| Eaton, trustee, commissions | $182 75 |
| "Additional expense" | 200 00 |
| Livingstone, as attorney for trustee | 175 00 |
| Shall, attorney for Nelson | 50 00 |

In none of these actions does a single item of the trustee's expense appear. As the basis for such annual allowances as $175, $200, and $400, the trustee merely files an affidavit that he, in the discharge of his duties as trustee, has kept a horse, wagon, sleighs, etc., and has expended therefor at least the flat sum which he is allowed. That the trustee, his attorney, and the attorney for the cestui were working in entire harmony is evidenced by the fact that the last annual decree appears to have been fully prepared, containing proposed allowances, and was "O. K.'d" by the attorneys for the trustee and cestui, thereby signifying their willingness to be allowed the sums asked for.

[4] When one reflects that there is no law requiring any annual accounting by a testamentary trustee, and that the evidence in this case is barren of any reasonable excuse for the annual rests that were taken, and when one further reflects that the Surrogate's Court of Herkimer county has ample jurisdiction to entertain proceedings to account by trustees, and that it is to such tribunal as that from which their appointment came that trustees almost universally apply for settlement of their accounts, and where, if the trustee honestly felt that he would be best protected by annual settlements in court, such accountings could be carried through at an expense of from $25 to $40 for each accounting, the conduct of this estate shocks one's sense of right. Without the slightest authority or legal warrant, flat sums ranging from $130 to $400 are annually allowed to the trustee by way of "extra expense" and "extra allowance," and not an item showing the nature of such expense. These additional allowances are alone supported by affidavit of the trustee to the effect that he has kept a conveyance and used it in the discharge of his duties—an item of expense which clearly cannot legally be allowed him. Pullman v. Willets, 4 Dem. Sur. 536; Matter of Ingersoll, 6 Dem. Sur. 184. This doctrine has never been questioned. The trustee's attorney is annually allowed sums ranging from $175 to $350, amounts out of all proportion to what he could have possibly earned, and even the attorney for the poor cestui is annually given a substantial allowance for appearing in court and admitting the allegations of the complaint; and an accountant performing services for which the trustee was paid is allowed, without any warrant in law, the generous sum of $400 for his services.

It seems incredible that such a condition of affairs could have existed as is revealed in this case. That a court could have been so

imposed upon, that one sworn to serve in a position of trust over an estate should have been a party to such annual raids as were made upon the estate in his keeping, passes all understanding. And in the face of all this we find upon a provision in the decree in the final accounting, after the death of the cestui que trust, that the trustee, "having honestly and fairly administered his said trust and managed the trust property for the best interest of said estate, he is hereby allowed commissions and compensation for the same to the amount of six hundred seven and $^{54}/_{100}$ dollars ($607.54), and for expenses incurred by him on this accounting and otherwise," and authorizing said trustee to retain possession of the trust real estate until he receives the full amount of such commissions and compensation; and Livingstone, as his attorney, is allowed $500 for his services and expenses. While it is true that the Supreme Court had jurisdiction to hear these annual accountings, yet, in the light of other circumstances in this case, it would look very much as though the trustee, who had been favored with such generous treatment by way of "extra expense" and "extra allowances," or his attorneys, who found these annual excursions so much to their profit, were attending as fully to their own interests as they were to the protection of the estate in their charge. How profitable the connection of the trustee and his counsel with this estate was may be seen when the total fees allowed them in the annual accountings for the years 1899 to 1904, inclusive, amount to $4,697.71. Who would have possibly been injured had none of these actions been brought? The cestui was not troublesome, for he annually consented to the accounts as rendered. Never was an item of the trustee's accounts disputed. It is not strange in the light of the disclosures in this remarkable case that in times of unrest unthinking people charge the entire legal profession with knavery, and the demagogue be able to so influence the public mind as to destroy confidence in our courts, and to create a considerable sentiment for the recall of judicial officers.

While perhaps the administration of the Nelson trust estate may have little bearing upon the issues in this action, yet the spirit of avarice displayed in the course thereof is in entire keeping with the treatment accorded this plaintiff when the trust estate passed to her. Eaton, the trustee, was in charge through it all, and led in advising plaintiff that she could claim no interest in the trust estate, not having had a child by Fred. Livingstone, the trustee's son-in-law, was the favored attorney in the last two annual accountings, and he it was that engineered the final adjustment so disastrous to his client, but profitable to himself. In December, 1905, Eaton consulted with Livingstone about making his final account as trustee, and the latter began the preparation of said account. Livingstone then suggested to plaintiff that such accounting must be had, and that thereon he would act for the trustee and that she must have some one appear for her. Thereupon, on December 18, 1905, at Livingstone's suggestion, the plaintiff employed Mr. Frank Shall, a young attorney in Livingstone's office, or in an office adjoining and communicating with the office of Livingstone. Not only did the plaintiff thus employ Shall, but a formal retainer was prepared and typewritten by the Livingstone-Shall

stenographer, and signed and acknowledged. This instrument, prepared and executed with such formality to employ an attorney to appear on an accounting, reads as follows:

"Supreme Court. Herkimer County.

"In the Matter of the Judicial Settlement and Trusteeship of Irving Eaton, as Trustee Under the Last Will and Testament of George Nelson, Deceased.

"I, Bertha J. Nelson, of Little Falls, N. Y., widow of Fred G. Nelson, deceased, the son of said George Nelson, deceased, do hereby retain Frank H. Shall, attorney at law, of Little Falls, Herkimer county, N. Y., to appear for me as my attorney in the above-entitled matter, now or whenever the said accounting and settlement shall be made or begun, and to look over and pass on the same and to take such steps or proceedings as he may deem desirable therein for me and in my interest. I hereby agree to pay said attorney a reasonable amount for and in consideration of his services and his expenses therein.

"Witness my hand and seal this 18th day of December, 1905.
                                        "Bertha J. Nelson [L. S.]

"State of New York, County of Herkimer, City of Little Falls—ss.:

"On this 18th day of December, 1905, before me personally appeared Bertha J. Nelson, to me known and known to be the person described in and who executed the foregoing instrument, and she thereupon duly acknowledged to me that she executed the same.
                                        "William S. Rhodes, Notary Public."

It will be noted that the employment of Shall was only in relation to the judicial settlement of the accounts of Eaton as trustee. And, indeed, Shall testifies: "That retainer was more to look after the accounts of Eaton, as trustee, his management of the farm." But we shall see later on how little regard was felt for the limitation of this retainer. In the negotiations which were carried on subsequent to the making of the agreement of February 15, 1906, whereby the plaintiff retained Livingstone to negotiate a settlement with the Nelson heirs and had agreed to divide with him whatever could be realized, the plaintiff took no part, Livingstone exercising unlimited authority in the premises. The brother and nieces of George Nelson were represented by A. M. Mills, of Little Falls, N. Y., an attorney of conceded ability, and for many years a leader at the bar in Central New York. Senator Mills appears to have been given entire control of the negotiations in behalf of his clients. That he fully understood that those he represented had legally no claim to any part of the trust estate, and that as a lawyer, whose legal attainments were such that he could not have been in ignorance of well-settled principles of law, he fully appreciated that the plaintiff was entitled to the entire trust estate, hardly admits of doubt. Indeed, Senator Mills' connection with the transaction shows conclusively that he fully appreciated the legal status of the parties. The record is barren of evidence showing that he ever claimed that his clients were entitled by law to any part of it. Mr. Millard N. Pearce, the husband of the defendant Kate Pearce, one of the nieces, and who seems, in a way, to have represented the four sisters, of which his wife was one, when testifying as a witness in behalf of defendants and in response to a question by the court as to whether Senator Mills had advised the defendant heirs as to their legal rights, answered: "He never told me that; no, sir." On being

further pressed, Pearce testified: "He [Mills] never told me who owned the property. He said it was a question." Senator Mills as a witness failed to testify that he had ever advised his clients that they had any claim in law to any part of the George Nelson trust estate. And nowhere in the answer of the Nelson heirs to the complaint of Eaton as trustee in his final action to account, which Senator Mills prepared and himself verified as attorney for said heirs, does he allege or claim that his clients owned any part of the trust estate in question. And in the deed to plaintiff of the undivided half of the Churchill farm, which was drawn by Senator Mills, he was careful to have his clients merely remise, release, grant, and convey to plaintiff without covenants of title or warranty, except against the grantors' own acts. The strongest position that Senator Mills seems to have taken at any time during the negotiations or since was that his clients claimed to be entitled to the trust estate. And the answer of the Nelson heirs in the accounting action does not go so far as to allege even a claim of ownership in said defendants, but alleges that this plaintiff claimed she had some dower right or greater interest therein, and over which there was a contention. The absence of any claim of ownership, coupled with the fact that Senator Mills himself verified the answer in behalf of his clients, is not without significance.

There is an abundance of proof in the case that the Nelson heirs were putting forward claims to the property in question, and that every one who had any relations with the plaintiff, the Nelsons, the trustee Eaton, and Livingstone were always voicing the idea that plaintiff had no interest in the trust estate. Even her own husband and her mother-in-law, Elnora Nelson, had told her that her interest depended entirely upon her giving birth to children by Fred. She was never consulted about the management of the trust estate, and never saw the George Nelson will until the year 1911. Under such circumstances, it is not strange that plaintiff never dreamed of her actual rights. Were the Nelson heirs in ignorance of plaintiff's rights, and were their so-called claims to have succeeded to the trust estate by inheritance as heirs at law of George Nelson, deceased, advanced in the belief that they were founded upon law and right? In other words, were their "claims" based upon belief in their justice? Clearly not. It does not appear that their counsel ever so advised them. Indeed, Pearce testifies: "He never told me who owned the property. He said it was a question." Unquestionably they were putting forth claims, and insisting upon them with almost suspicious reiteration. It is not unlikely that promptings of avarice caused them to regard their own claims as the only blood relatives of George Nelson as superior to the legal rights of plaintiff, an uneducated woman whose only claim came from an alliance by marriage with a dissolute son of their kinsman, and that, that son having died as the result of his excesses without leaving children, their sense of equity eliminated the plaintiff, a stranger to them, from sharing in the property. Quite likely through the indulgence of such reasoning they were able to justify themselves in claiming the property. That they had no honest right thereto they well knew.

[5] In representing his clients in the transaction and the negotiations which resulted so profitably to them Senator Mills was their agent. For what he said and did those whom he served must be held responsible. The fruits of his efforts were for their enjoyment. He was given paramount authority to act. The principals ratified their agent's acts, and must adopt as their own the instrumentalities by which they were consummated. Elwell v. Chamberlin, 31 N. Y. 611; Meehan v. Forrester, 52 N. Y. 277; Adams v. Mills, 60 N. Y. 533; Crans v. Hunter, 28 N. Y. 389. Mills knew where the legal right to the trust property reposed. If Livingstone, who assumed to look after the interests of plaintiff, knew, then but little is required to spell collusion. But if plaintiff's counsel was ignorant of the rights of his client, which, it seems to me, considering all the evidence, is far more probable, then plaintiff in her ignorance, through false representations judiciously put forth, was led to believe that she had no right to the trust estate, and was induced to part with her valuable rights, and to believe that the half interest in the Churchill farm had been "scared" out of the Nelson heirs by her attorney. The negotiations appear to have, for the most part, occurred at Senator Mills' office, to which Livingstone made frequent pilgrimages. Livingstone was seeking Mills—quite out of harmony with his present claim that he regarded plaintiff's rights as clear. That Mills was able to exercise a strong influence over plaintiff's representative is plain.

[6] The evidence shows to my satisfaction that the transfers were made by plaintiff under a mistaken idea of her legal rights, or, rather, in an entire absence of knowledge concerning them. While equity will not relieve for a mistake of law, no other elements being present, yet in cases of fraud the rule is different. As stated by Finch, J., in Haviland v. Willets et al., 141 N. Y. 35, at page 50, 35 N. E. 958, at page 960:

"It is equally well settled that where there is a mistake of law on one side, and either positive fraud on the other, or inequitable, unfair, and deceptive conduct, which tends to confirm the mistake, and conceal the truth, it is the right and duty of equity to award relief."

Also, to same effect, Berry v. Am. Cent. Ins. Co., 132 N. Y. 49, 54, 30 N. E. 254, 28 Am. St. Rep. 548.

As a lawyer, Senator Mills may not have been called upon to reveal to his adversary, if such he was, any weakness or infirmities concerning the "claims" which he asserted his clients were making, nor to enlighten opposing counsel as to plaintiff's rights. Ward v. Town of Southfield, 102 N. Y. 293, 6 N. E. 660. But his clients should not be permitted to retain property which they were able to obtain by reason of plaintiff's ignorance. If anything more is required to show that there was a concerted plan to overreach this unfortunate plaintiff, it is furnished by the events which followed close upon the making of the agreement of division of the trust estate, and, indeed, before the deeds had actually passed. Early in April, 1906, the trustee, Eaton, launches the much heralded action to finally account for his acts as trustee. The cestui, Fred G. Nelson, had been dead for over a year, during which period Eaton had remained in the possession and management of the trust estate. Assuming that Livingstone tells the truth

when he says he knew plaintiff had legally succeeded to the entire trust estate, what was the necessity of any formal accounting? The real estate took care of itself. By law it passed to the plaintiff. After the death of Fred, the trustee had no control whatever over it. All that was necessary for him to do was to sit down with Fred's widow and account for his acts since his last previous accounting—a period of only a few months. Had he followed such a course, who could have objected? Absolutely no one. He does not apply to the Surrogate's Court of Herkimer county from which his appointment emanated, but he once more brings action in the Supreme Court, which in the past he has found so satisfactory. The excuse offered by counsel for defendant for not proceeding in Surrogate's Court, that Judge Livingstone, the attorney for the trustee, was at the time surrogate of Herkimer county by appointment, and was therefore disqualified from passing upon his father-in-law's accounts, is more ingenious than satisfying. The Code authorizes the district attorney to act in any case when the surrogate is disqualified, where there is no special surrogate or county judge who can serve. And it is somewhat strange that in so carefully observing the ethics of his official position the attorney for the trustee should have entirely overlooked the plain provisions of section 2495 of the Code of Civil Procedure, prohibiting a surrogate from acting as an attorney or counsel in a civil action or special proceeding for or against a testamentary trustee over whom or whose estate or accounts he could have any jurisdiction by law.

In the Supreme Court action which Livingstone brought for the trustee the summons bears date March 29, 1906. Notwithstanding the fact that he claims to have known that plaintiff alone was legally interested in the trust estate, Livingstone joins with her the defendants Walter Nelson, Kate Pearce, Ida W. Fenner, Elva W. Pomeroy, and Jeanette Willoughby as parties defendant. The complaint is verified on the 3d day of April, 1906, and, considering that this is simply an action to account on the part of the trustee seeking to be relieved from the responsibility of his trust, it is a most remarkable document. The pleading starts off with a recital of the facts leading up to the appointment and qualification of the plaintiff, as trustee, and his entry upon the discharge of his trust. Then follow extended allegations of the several Supreme Court actions for the annual accountings by the trustee. The complaint then recites the death of the cestui que trust, leaving the plaintiff, his widow, him surviving; and that the said cestui left a last will and testament, which "*was duly admitted to probate* by the Surrogate's Court of Herkimer county"; the further allegation "*that in and by the terms of the said will of Fred G. Nelson, deceased, defendant, Bertha J. Eysaman,* then Bertha J. Nelson, *received and became entitled to and seized of all property, real and personal, of the said Fred G. Nelson, deceased*"; that plaintiff was named and duly qualified as executrix of her deceased husband's will; and that the trust in the George Nelson will terminated with the demise of Fred G. Nelson. All of the above-described allegations were unquestionably truthful, and were quite appropriate to the action by the trustee to account for his acts.

But the complaint does not stop there, but continues with a most remarkable allegation, and so utterly foreign to the scope of an action to account as to at once arouse suspicion that there was some ulterior purpose for its interpolation, and explains why the Nelson heirs are joined with the plaintiff as parties defendant. The allegation is as follows:

"Upon information and belief the plaintiff further alleges that the defendants, Walter Nelson, Kate Pearce, Ida W. Fenner, Elva W. Pomeroy, and Jeanette Willoughby, constitute and are all of the heirs at law and next of kin of the said George Nelson, deceased, and *as such became seised of and owners of all the real estate and personal property constituting the trust estate* and left by said George Nelson and existing at the time of the death of Fred G. Nelson aforesaid; that the defendant Walter Nelson was entitled to one-half of said estate; and that the nieces were each entitled to receive one-eighth of said estate."

Having included such allegations in the complaint, how absurd becomes the present position of the trustee's attorney that he then knew that such allegations were false, and that the plaintiff was the owner and entitled to the entire trust estate! On being pressed to explain the discrepancy between what he had his client swear to, and which as attorney he himself had signed, and that which he on the trial insisted he knew, Livingstone makes the lame excuse that the complaint was Eaton's, and that he drew it so as to conform to his client's notion rather than his own knowledge—a most extraordinary position for a lawyer to take. If anything was required to show that Livingstone was innocent of any knowledge of his client's legal right to the trust estate, or knowing that the property belonged to her became a party to a conspiracy to deprive her of it, it is furnished by these allegations of his complaint. But that it was not a mere accident that the Nelson heirs were joined with plaintiff as parties defendant in this "action for a final accounting" by the trustee, and that there was a real reason for the bringing of this action so close upon the heels of the Mills-Livingstone settlement, and indeed before it was consummated by the passing of the deeds, becomes apparent as the succeeding allegations of the complaint unfold themselves. The complaint continues with allegations: That on or about March 2, 1906, the widow of Fred G. Nelson, "the sole and only legatee and devisee" under his will, duly sold and transferred to the defendant Nelson heirs the Nelson home farm of 326 acres and the Danube farm of 219½ acres; that such conveyance was upon good consideration, and that thereby the grantees became seised of said two farms; that on said March 2, 1906, the Nelson heirs conveyed to the plaintiff Bertha J. Eysaman the undivided one-half of the Churchill farm, and that she was then seised thereof. As a matter of fact, such conveyances could not have been made at the time said complaint was verified, although the deeds were dated on March 2, 1906, because the authentication of the last-mentioned deed and the mortgage given concurrently by the Nelson heirs was not completed until April 25, 1906. So that the decree which was granted April 6, 1906, in the action ratified conveyances that had not been made.

The complaint further alleges the purchase by the Nelson heirs of the stock on the Home and Danube farms from plaintiff for $3,200, and the payment therefor with trust funds.

The complaint closes with a prayer that the trustee's accounts be judicially settled and allowed as therein stated, and that all his proceedings as shown in said complaint be passed upon and approved by the court, that he be allowed commissions and expenses, and that he and his bondsmen be discharged from further liability or responsibility, and for such other or further or different relief as to the court may seem just and equitable, "besides an allowance for the costs and expenses of this action." While this prayer does not specifically ask for the ratification of the "settlement" effected by Mills and Livingstone, a cursory perusal of the complaint reveals that the concealed purpose of the action was to clinch by a decree of the Supreme Court a transaction whereby an ignorant and confiding woman was being relieved of a valuable estate without consideration.

The complaint was verified by Eaton, the trustee, on April 3, 1906. Livingstone testifies that he personally served the summons and a copy of said complaint upon the plaintiff, Bertha J. Eysaman, in Little Falls (at what place it does not appear), on the day of its verification or the day after, and explained to her what it was, and that she should take it to her attorney. Mrs. Eysaman denies that she was served or informed as to the contents of the complaint. Strangely no proof of service was filed. Shall testifies that she brought the summons and complaint to him, and that he had it two days in his possession to examine and prepare her answer. In this Shall is clearly mistaken, as the answer which he prepared was verified on the 4th day of April, 1906—the very day when Livingstone says he may have served plaintiff. The summons and complaint which it is claimed was served upon Mrs. Eysaman was not produced upon the trial; Shall disclaiming any knowledge of the whereabouts of the document. The plaintiff denies the service, and disclaims any knowledge that an action was pending to adjudicate as to the title or disposition of the trust estate. She asserts that Livingstone informed her of the necessity of an accounting in court by the trustee, and that he could not represent her, but that Shall, who had a communicating office with him, could do so; and that she was then led to sign a paper which was not read to her, but which she understood related to Eaton's accounting, with which she had been led to believe she had no concern. Shall never presented to his client any bill, nor did she pay him anything for his services. He never consulted with his client as to her rights, and took no steps to investigate the same. His allowance of $50, made in the decree, was paid by the Nelson heirs. The fact that her written retainer of Shall as her attorney authorized him to appear for her only in proceedings by Eaton to account and the other attendant circumstances amply corroborate plaintiff's version.

[7] As a pleading the answer which Shall says he prepared, and which bore unmistakable evidence of having been typewritten on the same machine as the complaint, is certainly sui generis. It admits each allegation of the complaint, then alleges that Eaton is trustee and

has executed the trust as alleged in the complaint, that he has received and paid out the amounts set forth in the accounts contained therein, and on information and belief that the account as presented by the trustee is correct and should be allowed, and prays that the plaintiff have the relief prayed for by him in the complaint. The "answer" contains nothing more. No such pleading as this is authorized by law or practice. Section 500 of the Code of Civil Procedure provides what an answer shall contain: "(1) A general or specific denial of each material allegation of the complaint controverted by the defendant, or of any knowledge or information thereof sufficient to form a belief. (2) A statement of any new matter constituting a defense or counterclaim, in ordinary and concise language without repetition." The "answer" served in behalf of Mrs. Eysaman surely had no warrant in law. Why was such an answer interposed? Manifestly with a design to show that she knew the contents of the complaint, and to estop her from afterwards questioning the truth of its allegations concerning the disposition of the Nelson trust estate. It is quite possible that Shall, at the time, may have been innocent of knowingly attempting to overreach plaintiff, but he certainly permitted himself to be used for such purpose. Livingstone testifies that he served the summons and complaint upon the defendant Walter Nelson in the city of Utica. Senator Mills testified that he guessed it was early in March that he was aware of the trustee's action; that he thought Mr. Walter Nelson brought him a copy of the summons and complaint; "that it had been mentioned that they would have an action to settle Mr. Eaton's accounts." On April 5, 1906, two days after Eaton verified his complaint, Mills appeared in the action for the defendants Walter Nelson and the four nieces, and himself verified and served an answer in behalf of his clients. The answer verified by Senator Mills before Livingstone as county judge is significant.

It also admits the allegations of the complaint, and then discloses its underlying purpose to confirm the "settlement" whereby plaintiff had been relieved of her property, and to obtain a decree of the Supreme Court which would effectually prevent plaintiff from ever thereafter attacking the same. The answer alleges that there was a dispute between the Nelson heirs and Mrs. Eysaman as to the ownership of the stock on the farms after Fred's death, and that each side was claiming the same. How this could be when Eaton years before had bought this stock of Fred and covenanted to return the same to his personal representative, and how the Nelsons could be then doubting Mrs. Eysaman's title thereto when they had paid her $3,200 the fall previous for this same stock, is hard to understand. The answer also somewhat hazily alleged that there was some dispute as to the ownership of the real estate; thus very adroitly putting forth the idea that there were disputed claims between the parties, and that the settlement effected was a good and sufficient consideration for the conveyance by Mrs. Eysaman to the clients of Senator Mills. The details of the alleged compromise and settlement are set forth at length, and in the prayer for relief judgment is demanded ratifying, confirming, and adjudging to be valid, lawful, and binding upon each and every of the

parties the "aforesaid settlement and compromise between these defendants and the said Bertha J. Eysaman, and all the conveyances, transfers, and payments made in pursuance thereof and in consummation thereof." The prayer further demands that the parties to such compromise be adjudged to be the owners of the property going to each thereunder. Thus it will be seen that from a simple, uncontested action by a trustee to account was evolved an action to ratify and confirm a most unconscionable transaction.

The Mills' answer was served on the day of its verification, April 5, 1906, on the plaintiff's attorney, and a copy thereof served on attorney Shall claiming to represent Mrs. Eysaman. Then on the day following, April 6, 1906, with the utmost diligence all hands—Eaton, the trustee, and Livingstone, his counsel, Senator Mills, representing the Nelson heirs, and Attorney Shall, appearing for Mrs. Eysaman—betake themselves into the presence of the Supreme Court, there to obtain adjudication of the "issues" in the action. Eaton and Walter Nelson are briefly sworn, but not cross-examined. A previously prepared decision and final decree are presented to and signed by Mr. Justice Scripture. The decree allows and passes the plaintiff's accounts, and approves of his various acts as trustee, and then proceeds to accomplish the evident purpose of the action by ratifying, confirming and adjudging to be lawful, valid, and binding upon the parties the "said settlement, compromise, and agreement," and confirming the conveyances alleged to have been made in accordance therewith, but which in fact had not yet been made, for the reason that they had not been delivered. Said final judgment further decrees the title and ownership of the Homestead and Danube farms and all the trust estate, save the half interest in the Churchill farm, to be in the Nelson heirs, and that of the Churchill farm to be in Mrs. Eysaman.

The decree directs the trustee to pay from out of the balance of moneys in his hands the following allowances: "To Robert F. Livingstone, his attorney, five hundred dollars ($500.00); to A. M. Mills, attorney for defendants Nelson et al., seven hundred and fifty dollars ($750.00); and to Frank Shall, attorney for defendant, Bertha J. Eysaman, fifty dollars ($50.00)." These allowances are followed, not without significance, with the adjudication: "That the said Fred G. Nelson, cestui que trust, having died, the said trust is at an end." The trustee is allowed commissions to the amount of $607.54 and "for expenses incurred by him on this accounting and otherwise," payable from the trust funds in said trustee's hands after the payment of allowances to the attorneys, and, if sufficient moneys did not remain after payment of said allowances to attorneys, it was decreed that Eaton, the trustee, should have a lien upon the real estate adjudicated to the Nelson heirs, and the income to be derived therefrom in the immediate future, and authority given him to retain possession of said real estate and receive the future income therefrom until paid the full amount of said commission and compensation. The absurdity of such a provision is rivaled only by the amount of the allowances made to attorneys for services rendered during a period of not to exceed two or three days, and involving no contest.

I have endeavored to relate somewhat in detail the circumstances surrounding this controversy. Therefrom it is apparent that there was concerted action on the part of the Nelson heirs, aided by able counsel and by the trustee, Eaton, to withhold from plaintiff property to which she was justly entitled; that plaintiff was in entire ignorance of her rights, and so remained until shortly before the commencement of this action; that either Livingstone was unaware of his client's rights in the premises, and became a most passive tool in the hands of others better informed, or he was a party to a deliberate scheme to defraud his client. It must be conceded that his conduct in relation to the action of Eaton to account and the manifest intention through the instrumentality of such action to forever foreclose an ignorant and confiding woman from asserting her rights should some future day discover them to her is hardly reconcilable with the theory of ignorance. The preconceived purpose of that action is all too apparent. In my opinion the bringing of this action, the interpolation of matter so foreign to the accounting of the trustee, the concert of action of the parties engaged in carrying on the action, and its consummation in the decree, furnishes the strongest kind of evidence of the conspiracy to deprive this unfortunate woman of her property. If the settlement was honest and the deed obtained from plaintiff a valid one, untainted by fraud, why was such a decree necessary? If the transaction was clean and above board, no Supreme Court decree was required to confirm it. The deal was a questionable one, and the perpetrators believed it needed fortifying, and in their efforts to clinch the affair they overreached and branded the whole transaction as a fraud. The motives which actuated the Nelson heirs are easy to understand. It was not strange that they entertained a prejudice against the daughter-in-law of their kinsman, who bore no blood relationship to the deceased nor to them. They undoubtedly considered her an interloper, who had no claim, except as the widow of a dissolute son of their kinsman, from whom indeed she had separated before his death, and, he having died without leaving a child, the blood relatives of George Nelson undoubtedly looked with jealousy upon a stranger inheriting this valuable estate, in the accumulation of which she had had no hand. But the prejudices of these so-called "heirs" should not be permitted to deprive the plaintiff of that which the law clearly gives her. And, if it appears that those who have no legal right to this property have acquired it by means of a fraud perpetrated upon the rightful owner, equity should reach out and take from the wrongdoers the fruits of their dishonest acts and restore them to the person entitled thereto.

[8] In any event, the plaintiff was induced to enter into a most unconscionable bargain. In ignorance of her rights she was led to part with a valuable estate without a particle of actual consideration.

There are certain facts over which there can reasonably be no controversy.

First. The plaintiff owned and was entitled to receive the entire remainder of the trust estate upon the death of her husband. This property became hers absolutely, subject only to an accounting by the trustee for his acts.

Second. Plaintiff was entirely unaware of her rights, and continued in such ignorance until long after she had been led into signing away her title thereto.

Third. Plaintiff, while uninformed of her legal rights, through a fraud practiced upon her, was induced to sign away the same, and in her ignorance and believing that her counsel was guarding her interests was lulled into allowing a decree of the Supreme Court to be taken which was a part of the fraudulent scheme, and by which the parties thereto sought to bind the plaintiff and to fortify their fraudulent acts.

Fourth. This property, aggregating about $40,000, was taken from plaintiff without the shadow of a consideration at the time.

The only possible excuse for consideration now offered by the heirs is that the adjustment and division was in settlement and compromise of a disputed claim. But no such dispute ever existed. Plaintiff was ignorant that she had any claim. Livingstone, whether ignorant or not, was urging no such claim. The defendant heirs now for the first suggest that the will of Fred G. Nelson, plaintiff's husband, was open to attack, and that with that will out of the way, the Nelson heirs would on Fred's death intestate inherit the trust estate as his heirs at law. That no such claim was made by them or suggested at the time appears beyond question from the evidence. Such claims as they were making at the time, while not made in good faith, were made on the theory that they were the heirs at law of George Nelson, and not of Fred G. Nelson. Nowhere can be found a suggestion of any claim through Fred, except the intimation claimed to have been made by their attorney that there might be a question as to Fred's will. But this suggestion seems too evidently to be an afterthought.

[9] The evidence of the absence of any such claim being made at the time is altogether too overwhelming to entitle it to serious consideration. Quite in conflict with such position are the following circumstances:

First. The will of Fred was admitted to probate without contest. The heirs must have been parties to that proceeding.

Second. In the fall of 1905, the Nelson heirs purchased $3,200 worth of stock of plaintiff as executrix of her husband's estate, and whose only title thereto came through Fred's will. They then made no question as to the validity of the will.

Third. In the Eaton complaint it is alleged that the Fred G. Nelson will was duly admitted to probate, and that thereby plaintiff as devisee became seised of the undivided half of the Churchill farm which her husband had inherited from his mother.

Fourth. Senator Mills' answer in behalf of the Nelson heirs admits said allegations of the trustee's complaint.

Fifth. In said answer of the Nelson heirs, at folio 5, we find the following positive allegation:

"The said Bertha J. Eysaman owned the other undivided one-half of the said Churchill farm in her own right."

How did she own it? *Only through her husband's will.*

Sixth. The decision and decree in the trustee's final action to account, in which all concurred, specifically sets forth the nature of the

dispute, as relating to the trust estate under the George Nelson will, and not including the undivided half of the Churchill farm which never was part of said trust estate, but which came to plaintiff by her husband's will.

Seventh. On the "trial" before Justice Scripture, Walter Nelson testified that the dispute between the Nelson heirs, of which he was one, and Mrs. Eysaman, was with reference to the trust property; they claiming it as heirs of George Nelson, whereas the widow claimed through Fred. And Walter Nelson, in response to a direct question by his counsel, Senator Mills, testified unequivocally that *"Bertha Nelson owned one-half of the Churchill farm in her own right."* This was in reference to the "dispute" as it was then being exploited. The defendants here are bound by that decree. They are not attacking it, and are seeking to avail themselves of its provisions.

Eighth. Nowhere in the pleadings, papers, proceedings, decision, or decree in the Eaton action to account can there be found the suggestion of any dispute founded upon the invalidity of Fred's will.

Ninth. Fred's will was executed October 8, 1900, nearly five years before his death. It was witnessed by Eaton himself, and the disposition thereby made of his property was entirely reasonable. He was childless, and both his parents were dead. His only relatives were an uncle and cousins widely scattered, one residing in California. What more reasonable disposition of his property could he make than to his wife under such circumstances? It is evident that the claim that the validity of Fred G. Nelson's will was a factor in their settlement is a desperate afterthought. No such claim was asserted. The "claim" which the defendants, Walter Nelson and the nieces, did make that they took the trust estate as heirs of George Nelson, was, as I have already suggested, perfunctory only. They and their counsel knew at the time of the alleged compromise that they had no such claim. It was judiciously advanced with a view of obtaining the property. It had no substance. It is practically conceded that the Nelson heirs had absolutely no right to any part of the trust estate; that on Fred's death it became a part of his estate, and passed under his will to plaintiff. Not having even a colorable right to the trust estate, their claims were without substance.

[10] Undoubtedly forbearance to assert either a legal or equitable claim will constitute a sufficient consideration. A compromise of a disputed claim may form a sufficient consideration. But there must at least be a colorable claim. The matters in issue between the rival claimants must be in some doubt. It is not necessary that the party claiming to have been injured by the compromise should have a right to hold. It is sufficient if it is doubtful—"colorable." But here there was never any claim made in good faith. It was not colorable. Mr. Justice Jenks, in an able opinion, in Springstead v. Nees, 125 App. Div. 230, at page 232, 109 N. Y. Supp. 148, at page 150, thus states the rule:

"But if the claim be not even doubtful or colorable or plausible, in that there is no reason for an honest belief that it has some foundation in law or equity, then forbearance applied to it is not good consideration."

Parsons, in his work on Contracts ([5th Ed.] vol. 1, p. 440), states the rule limiting the extent to which the compromise of a disputed claim is effective as a consideration, as follows:

"An agreement to forbear for a time proceedings at law or in equity to enforce a well-founded claim is a valid consideration for a promise. But this consideration fails if it be shown that the claim is wholly and certainly unsustainable at law or in equity."

Wharton on Contracts (section 532) says:

"The fact that the suit is not well founded makes no difference if it has a show of title, though it is otherwise in cases of fraud, and in cases where the claim to be forborne is utterly destitute of support."

Also, see, Sherman v. Barnard, 19 Barb. 291, 302.

In the case at bar there was not even a colorable claim, and it was not made in good faith, but in an effort to overreach the absolute owner of the property. And again there was no dispute. Plaintiff was in ignorance of her rights. Her counsel, unless a party to the fraud, was no better informed than his client. That he could have made claim that plaintiff was entitled to the trust estate is not supported by the weight of evidence. There being no dispute, there was no compromise. Dolcher v. Fry, 37 Barb. 152, 155, 156, 157; Russell v. Cook, 3 Hill, 504. To make the settlement of a disputed claim a sufficient consideration, the transaction must be clean and without suggestion of fraud. As said by Chief Judge Follett in Wahl et al. v. Barnum et al., 116 N. Y. 87, at page 95, 22 N. E. 280, at page 282 (5 L. R. A. 623):

"In the absence of fraud or duress, a settlement of a disputed claim preferred in good faith by a promisee against a promissor is a legal consideration for a promise."

Also see Steart v. Ahrenfeldt, 4 Denio, 189; Feeter v. Weber, 78 N. Y. 334, 337.

[11] The contention that the waiver of the Nelson heirs of their right then open to them to move in Surrogate's Court for a revocation of the probate of the Fred G. Nelson will under sections 2647 and 2648 of the Code then in effect formed a good consideration for plaintiff's deed is clearly an afterthought. Such a thing was not seriously considered by the parties. They had by their acts ratified the will. Months before they had taken from plaintiff as executrix $3,200 worth of personal property, and plaintiff's only right to sell the same was through said will. By so doing and their admissions and allegations in relation to said will in the Eaton action would seem to estop them from questioning its validity or the probate thereof. As was said by Parker, J., in Matter of Peaslee, 73 Hun, 113, at page 115, 25 N. Y. Supp. 940, at page 941:

"*He who receives money or property*, or a benefit of any kind *under an instrument, whatever its character*, or his relation to the maker of it, *cannot question the instrument in whole or in part.*"

If their acts do not estop them, they surely conclusively show that any such procedure was not thought of at the time.

[12] Not only was the Eaton judgment obtained by fraud, and

indeed was part and parcel of the scheme to deprive plaintiff of her own, but, so far as affecting plaintiff's property rights is concerned, should be held to be ineffective. Plaintiff swears she was never served with the summons and complaint. In so testifying she contradicts Livingstone, who says he served her on the day the complaint was verified, April 3, 1906, or the day after, the 4th of April, but who never filed an affidavit of such service, and also contradicts Shall, who says she handed the paper to him, and he held it for two days and then prepared her answer. Shall is certainly mistaken, as the answer was verified on April 4th. Plaintiff's version is the more probable. She says she was given to understand that the paper which she was led to sign related to the Eaton accounting, and that she received no intimation that it affected the title to the trust estate. She signed the paper under the very natural impression that it related alone to the matter in which she had expressly retained Shall as her attorney, to wit, the trustee's accounting. Livingstone was really her attorney, although at his suggestion she temporarily retained Shall to represent her on the trustee's accounting. For all other purposes Livingstone was still her attorney. Her accounting as executrix under her husband's will was yet to be had. The "settlement" wherein Livingstone assumed to represent her was long after she had retained Shall to act for her on the accounting. Indeed, the relations of attorney and client between Livingstone and plaintiff must have continued until he received his $3,500 as his share of what plaintiff received, and which could not have been before some time in May, 1906, as the authentication as to the execution thereof by one of the mortgagors was not completed until April 25, 1906, by certificate that day made by the county clerk of Yolo county, in the state of California.

[13, 14] As before suggested, the allegations in the Eaton complaint concerning the alleged dispute and affecting the disposition of the trust estate were foreign to the scope of the action and foreign to what plaintiff had been led to believe was its purpose. The prayer for relief in the Eaton complaint is merely for an accounting, and nowhere asks that adjudication be made as to the disposition of the trust estate. The answer served on behalf of the Nelson heirs sought to lay the basis for such an adjudication, but plaintiff was not advised thereof. The adjudication obtained was as to no matter at issue under the complaint. It purports to determine issues between the Nelson heirs and a codefendant—this plaintiff. Cross-answers are claimed to have been served by Senator Mills, representing the Nelson heirs, and Shall, representing Mrs. Eysaman. Section 521 of the Code of Civil Procedure prescribes the practice in cases where the judgment may determine the ultimate rights of two or more defendants as between themselves, and provides that a defendant requiring such determination must *at least 20 days before the trial* serve a copy of his answer demanding such determination upon the attorney for each of the defendants affected thereby. The answer in this case must have been served, if at all, on the day of the trial, or possibly the day previous. But a more serious criticism to the attempted adjudication in this case is that it does not relate to a matter pertinent to the allegations of the complaint—to plaintiff's legitimate cause of action. The law is well

settled in this state that independent demands between codefendants cannot be litigated in an action, where such demands are foreign to the cause of action set up in the complaint. Kay v. Whittaker, 44 N. Y. 565; Binghamton Savings Bank v. Binghamton Trust Co., 85 Hun, 75, 32 N. Y..Supp. 657; Van Allen v. Rogers, 5 Misc. Rep. 420, 26 N. Y. Supp. 708; Lansing v. Hadsall, 26 Hun, 619; Jones v. Grant, 10 Paige, 348;; Elliott v. Pell, 1 Paige, 268; N. Y. Life Co. v. Cuthbert, 87 Hun, 339, 34 N. Y. Supp. 300. All that Eaton asked in his complaint was the settlement of his accounts as trustee.

[15] The decree in the Eaton action, so far as it relates to the trust estate and purports to adjudicate title thereto, is no bar to the claims of plaintiff in this action. House v. Lockwood, 137 N. Y. 259, 33 N. E. 595; Reynolds v. Ætna Life Ins. Co., 160 N. Y. 635, 55 N. E. 305. Disregarding the fraud that was perpetrated upon Mrs. Eysaman, the Eaton action and decree were final only as to the issues presented by the complaint.

[16] But the judgment was fraudulent and the decree fraudulently obtained and should be set aside. Dobson v. Pearce, 12 N. Y. 156, 62 Am. Dec. 152; Rice v. Bruff, 87 Hun, 515, 34 N. Y. Supp. 501; Vilas v. P. & M. Ry. Co., 123 N. Y. 440, 25 N. E. 941, 9 L. R. A. 844, 20 Am. St. Rep. 771; Kinnier v. Kinnier, 45 N. Y. 535, 542, 6 Am. Rep. 132; Davis v. Cornue, 151 N. Y. 172, 45 N. E. 449. As said by Judge Folger in Mandeville v. Reynolds, 68 N. Y. 528, at page 543:

"Judgment obtained by fraud upon a court binds not such court or any other, and its nullity upon that ground, though it has not been set aside or reversed, may be alleged in a collateral proceeding."

The fraud in obtaining the decree was not only upon the plaintiff, but upon the court itself. When appearances indicate that all parties to an action are represented, some excuse is furnished for relaxation of vigilance by the court and for granting a decree which all counsel unite in asking.

[17-19] So far as the defendant Livingstone is concerned, he has clearly obtained from plaintiff $3,500 to which he was not entitled. If he failed to understand plaintiff's rights, then he was guilty of gross negligence, and is entitled to no compensation. If, on the other hand, he fully understood his client's legal rights, he knew she was giving away the vast bulk of her estate, to which sacrifice he was consenting, and in the furtherance of which he was actively engaged. If he knew the trust estate amounting to substantially $50,000 as a matter of right belonged to his client, as he now says, then he entered into a most unconscionable contract whereby he was to receive one-half thereof, or $25,000, for getting what she owned. He must have known if the property belonged to his client that all that was necessary on her part was to take possession thereof. Courts are prone to scrutinize with great care contracts between attorneys and their clients. All such transactions are regarded with the greatest jealousy. "The clearest evidence is required that there was no fraud, influence or mistake— that the transaction was perfectly understood by the weaker party." Nesbit v. Lockman, 34 N. Y. 167. The facts did not justify Living-

stone in taking the $3,500 from his client. Such amount is out of all proportion to the service rendered. Turnbull v. Banks, 22 App. Div. 508, 48 N. Y. Supp. 40; Matter of Holland, 110 App. Div. 799, 97 N. Y. Supp. 202. The courts have even proceeded to the extreme of holding that the presumption is against the propriety of such a transaction. Nesbit v. Lockman, supra, 34 N. Y. 169; Hitchings v. Van Brunt, 38 N. Y. 335; Matter of Fitzsimons, 77 App. Div. 345, 79 N. Y. Supp. 194.

[20] The defendant Livingstone should restore to plaintiff the $3,-500 which he took from her, with interest. Nor does the fact that plaintiff assigned the mortgage for that amount to Livingstone's wife relieve him from liability to make restoration to plaintiff. Matter of Demarest, 11 App. Div. 156, 42 N. Y. Supp. 444; Reigal v. Wood, 1 John. Ch. 402.

The circumstances in this case further demand that the defendants Walter Nelson, Kate Pearce, Ida W. Fenner, Elva W. Pomeroy, and Jeanette Willoughby at once restore to the plaintiff the property thus wrongfully and without consideration obtained, and the deed given by plaintiff be set aside, and they should be required to account to plaintiff for the use and income therefrom for the period during which they have held it. They were never legally entitled to any part of the property in question, and therefore are not injured by returning it to the person rightfully entitled thereto. Proper provision should, of course, be made for the protection of innocent parties who have advanced money on the strength of the mortgage given by the Nelson heirs to plaintiff.

While the determination of this case necessarily involves unpleasant features, yet it seems to me that any other result than that indicated would be a gross perversion of justice, and a great wrong would stand uncorrected.